# EXHIBIT 1

## STATEMENT OF THE ISSUES

1.    Whether the District Court abused its discretion in sentencing Appellee, in light of her extraordinary family and community ties, mental and emotion health, use of embezzled funds for the benefits of others, extraordinary acceptance of responsibility and payment of restitution (particularly considering her economic means), her physical health, and other factors, including a combination of the foregoing?

2.    Whether the District Court erred by ordering a two-level sentencing enhancement for abuse of a position of trust when Appellee never admitted to holding any position other than a bank teller and in her alleged role as a bookkeeper, she did not even have discretion to write checks?

## STATEMENT OF FACTS

### I.   INTRODUCTION

On September 29, 2003, Appellee waived her right to be indicted and entered a guilty

plea to a one-count information which charges embezzlement in violation of 18 U.S.C. § 656.

The conduct admitted by Appellee was as follows:

> Between 1998 and March 2003, the defendant, while employed as a teller
> at the National Iron Bank, a financial institution insured by the Federal
> Deposition Insurance Corporation, embezzled $365,733.124, by making
> unauthorized withdrawals from accounts owned by customers of National
> Iron Bank. All such funds were converted to the use, and for the benefit,
> of Susan Godding. Susan Godding engaged in such conduct knowingly,
> willfully, and with the understanding that her conduct, which constituted a
> fraud upon the National Iron Bank, would cause financial injury to the
> National Iron Bank.

JA7-8, 15. Appellee admitted no facts concerning whether her embezzlement entailed her duties

as a customer service representative at the National Iron Bank (the "Bank") or as a bookkeeper

for Mrs. Morgan.

The plea was made pursuant to a plea agreement between Appellee and the Government.

In the agreement, Appellee and the Government agreed that, given the conduct admitted by

Appellee, including her acceptance of responsibility, under the Sentencing Guidelines,

Appellee's Guideline calculations resulted in a "total offense level of 15, with a criminal history

category I, which . . . results in a range of 18 to 24 months' imprisonment." JA11. The

Government did not reserve the right to seek an upward departure at sentencing. *See* JA11.

## II.    APPELLEE

### A.    Appellee's Background

Appellee is a hard-working woman who is deeply devoted to her family and to her community. SJA12, 20.[1] She is a 39-year-old mother of two. SJA2, 12, 20. She has resided in the Norfolk region of Connecticut virtually her entire life, where almost her entire family also is located. SJA8, 15. Appellee has worked since she was 15 years old, including for the Bank for 15 years. SJA16.

Appellee was convicted in state court on two occasions for sixth degree larceny, twenty and nineteen years ago respectively. SJA7. Between that time and the time of the subject offense, Appellee was a dedicated mother, wife, and daughter, and active in her community. SJA9, 12, 72, 91; *see also* letters attached to the PSR showing her involvement with neighbors, in the town, with the fire department, with the school, reproduced in the Supplemental Sealed Joint Appendix ("SSJA").[2] Her oldest daughter, from a prior relationship, is eighteen years old. SJA10. This daughter was adopted by Appellee's current husband. *Id.* Her youngest daughter is six years old. *Id.*

Appellee's life has been rife with troubled situations. Growing up, her mother was not affectionate or emotionally available. SJA8. At the age of 17, Appellee was witness to her father's sudden death by heart attack and this greatly affected her. SJA8. Appellee's mother was quite ill. She required care and regular treatment. SJA8. Appellee has never felt that her parents approved of her and always felt as though her brothers were favored. SJA8.

---

[1] Unless otherwise noted, the facts are presented as of the time of the two sentencing hearings before the District Court.
[2] A motion for leave to file the SSJA was filed on November 15, 2004.

3

Appellee's first serious relationship as an adult was with a man who abused her and abused drugs. SJA9. The relationship continued for approximately six years, but she ended it after the birth of her daughter. SJA9. Thereafter, she married David Godding. SJA10. Appellee and her husband do not make a great deal of money. SJA17-18.[3] Mr. Godding has extreme emotional problems and has emotionally abused his daughters. JA77-79, 86.

## B.    Appellee's Mental Disorder

Appellee suffers from a mental disorder whereby she is compelled to gain acceptance by others and to please others. SJA14. The District Court concluded that this disorder manifested itself by causing her to embezzle funds and use those funds to purchase gifts to gain familial and social acceptance, and to provide treatment to her older daughter. SJA11, 14-15; JA90.

Since the time the subject offense was discovered, Appellee received therapy for mental and emotional conditions from Judith Tsukroff, a local licensed marriage and family therapist, in Norfolk, Connecticut.[4] Appellee was diagnosed as suffering from long-standing Avoidant Personality Disorder. This disorder consists of a pervasive pattern of social inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation, beginning by early adulthood and present in a variety of contexts.

Ms. Tsukroff denoted the contexts applicable to Appellee: (1) her unwillingness to get involved with people unless certain of being liked; (2) her preoccupation with being criticized or

---

[3] In fact, what they earned was barely sufficient to pay their living expenses, not including the additional expenses for the care and treatment of their oldest daughter. SJA17-18. As reported by the Probation Officer, their net monthly cash flow, after all necessary living expenses are paid, is only $31.44. SJA18. Even while Appellee was working for the National Iron Bank, she was a part-time employee who earned only $11.93 per hour. SJA16. Even with her concurrent cleaning job and her job at the town hall, at the time the subject offense occurred, Appellee was earning approximately $300 per week, gross pay. SJA16.

[4] The findings of Ms. Tsukroff are included in the Appellee's Sentencing Memorandum, dated December 18, 2003, at Exhibit A, which the Government did not include in the Joint Appendix.

rejected in social situations; (3) her inhibition in new interpersonal situations because of feelings

of inadequacy; and (4) her view of herself as socially inept, personally unappealing, or inferior to

others. Ms. Tsukroff noted

> [Appellee] has a history of emotional neglect throughout childhood and
> suffered through an abusive first relationship. In her marriage she
> describes a cycle of love and emotional abuse. To [Appellee] who has not
> known another way of life, the abuse in this marriage feels normal and
> tolerable; and she does get love which she never had before when her
> husband expresses his need for her.

On this issue, the District Court concluded that "the defendant's mental health is a very

substantial [factor], not only in leading her to have taken the steps, the actions that she took, and

also, however, insofar as the impact of a sentence upon her, and in this regard, I think that

sections 5H1.3 and 5K2.3 are relevant." JA90.

## III.  APPELLEE'S FAMILY MEMBERS

### A.  Mr. Godding

While Appellee and Mr. Godding's relationship began well, it has turned into an

emotionally abusive and difficult relationship for Appellee. SJA10. Appellee still loves her

husband very much. SJA10. However, Mr. Godding has been emotionally abusing Appellee

and her daughters for years. SJA10.

Family members claim that Mr. Godding's demeanor changed after the birth of

Appellee's second child. SJA10, 12. He is "not rational," refusing to go out in public unless he

is going to work and, when at home, keeping the curtains drawn. SJA12. Mr. Godding's own

mother explained that he has had "an extreme emotional problem since day one. I've begged

him to go to therapy . . . and he refuses." JA86.

Appellee's older daughter, Cheyenne Godding, identified significant concerns for the

possibility of Appellee's then six-year-old daughter being left with Mr. Godding during

Appellee's incarceration. JA77. Ms. Godding stated that Mr. Godding is cruel and heartless, and that his emotional abuse in calling her stupid and worthless led to her addiction, eating disorder, self-mutilation, and burning. JA77-78. She recalled Mr. Godding even throwing scissors at her and telling her to go cut herself. JA77-78. When Ms. Godding told Mr. Godding that she been raped, Mr. Godding responded that she must have enjoyed it for her to have not told anyone about it initially. JA79-80. After Appellee's arrest, Mr. Godding threw Ms. Godding's possessions onto the front lawn and had put pizza boxes over the windows. JA78.

Ms. Godding further stated that her sister needs Appellee to protect her from Mr. Godding. Ms. Godding recounted hearing Mr. Godding tell her little sister that she needs to go on a diet. JA78. Also, while Appellee was at an Al-Anon meeting following the arrest, Mr. Godding told his six-year-old daughter that her mother was sick in the brain and that no one will ever help the daughter achieve her dreams. JA78-79. He also stated that because he will not allow himself to be humiliated in public, he will keep his young daughter in the house and out of extracurricular activities, including from spending time with her older sister. JA79. JA80. He did not come to court to support his wife at either hearing. E.g., JA26.

**B.    Cheyenne Godding, Appellee's Older Daughter**

Appellee has had to deal with her oldest daughter's serious troubles that began in 1997, when her daughter was just becoming a teenager. SJA10; JA52-53. She began using alcohol and drugs at the age of twelve, and is an addict and alcoholic, hitting at least one bottom at the age of seventeen. JA74-75; SJA10. This daughter has struggled since that time with an eating disorder, self-mutilating behavior, mental illness, and suicide attempts. SJA10; JA53. Additionally, she was a rape victim. *Id.*

6

As discussed above, Ms. Godding also suffered emotion and mental abuse from her adoptive father, Mr. Godding. JA75. Mr. Godding treated Ms. Godding's drug addiction and cutting as a joke. JA80. Ms. Godding stated that she became bulimic, thinking that if she looked better, he would be nicer. JA80. He was intolerant of Appellee's oldest daughter's behavior, and Appellee was caused to deal with her daughter's life threatening behavior on her own. She took on the complete emotional and financial burden herself. Because Appellee's husband did not believe in mental health treatment for anyone, Appellee had to hide her daughter's mental health treatment and the related bills from her husband. SJA10.

In contrast to Mr. Godding's behavior, Appellee has always been there for her daughter. For example, aware of her daughter's bulimia, Appellee monitors Ms. Godding's health. JA80. From the beginning, Appellee was a huge part in her daughter's recovery.

Ms. Godding experienced a relapse after learning that her mother could be taken from her. JA76. Ms. Godding lived alone, after her boyfriend had relapsed, beaten her, and been incarcerated. JA82. She also just learned that she was five weeks pregnant. JA82. In short, her need for her mother was critical. *E.g.*, JA85.

### C.    Appellee's Six-Year-Old Daughter

The District Court also heard that Appellee's six-year-old daughter needed her mother to protect her from Mr. Godding and to ensure that she will not have to feel as Ms. Godding did while growing up. JA80. No one could replace Appellee in caring for her young daughter, including her paternal grandmother. JA85.

### D.    Appellee's Mother

Appellee was her mother's caretaker; others in the family had not stepped up to take care of her. JA71, 81, 85, 229. Appellee's mother suffered from diabetes, heart problems,

7

"watermelon stomach,"[5] and other maladies, requiring routine hospital treatments and regular oxygen. JA71, 282. Meanwhile, Appellee was doing everything for her mother, including taking her to doctors' appointments, cleaning, cooking, shopping, assisting her while she works, sleeping over, ensuring that she has her medications. JA81. If Appellee were to have been incarcerated, her mother would not have received that care. JA81.

### E.     Appellee's Mother-in-Law

Appellee was critical in caring for her mother-in-law's parents, and provided her mother-in-law with the assistance that she needed to ensure that her parents received necessary care. JA85.

## IV.     APPELLEE'S "POSITION" DURING THE RELEVANT PERIOD

The PSR recounted that while Appellee worked for the bank as a bank teller and customer service representative, she also was a bookkeeper for Mrs. Morgan, a Bank customer.

> On occasion, Appellee would write checks against accounts that Mrs. Morgan held at other banks and used them to purchase bank checks from NIB for her own use. As Mrs. Morgan's bookkeeper, the defendant said that she had the authority to write checks against these accounts. Her positions with the bank and with Mrs. Morgan provided the opportunity to embezzle funds from Mrs. Morgan's financial accounts. Susan Godding embezzled $154,000 from Mrs. Morgan.

SJA4. However, Mrs. Morgan "indicated that Appellee did not have the authority to write checks from her accounts." JSA5.

The PSR recommended a two-level upward adjustment to Appellee's offense level computation, citing U.S.S.G. § 3B1.3 as grounds for finding an abuse of trust, "because her position at the bank as a bank teller/customer service representative and as a bookkeeper for a

---

[5] This condition consists of ulcerated veins that bleed through her stomach requiring regular cauterization and occasional transfusions.

8

significant account contributed to the defendant's ability to facilitate and conceal the offense."
SJA6.  Appellee objected to this computation.  SJA25.

At the First Sentencing Hearing,[6] the Government pressed this upward adjustment solely on the issue of Appellee's alleged role as a bookkeeper.  JA26-28, 51.  The Court accepted the recommendation of Probation, citing "her position both at the bank and being more than just a teller and her position in relation to Mrs. Morgan."  JA53.

## V.    USE OF THE EMBEZZLED FUNDS

A significant portion of the embezzled funds was used to pay for medical, mental health and court-related expenses for Appellee's oldest daughter.  SJA11, 45.  She also used a significant portion of the funds to provide for the necessary living expenses of her husband's sister and her family for at least two years.  SJA11, 45; JA53.  The majority of the remaining funds were used by Appellee to provide gifts, especially for her eldest daughter to make her feel better, and for family members and members of the community.  SJA11, 15, 45-46.

## VI.    POST-OFFENSE CONDUCT

Since committing the offense conduct, Appellee had been regularly meeting with a therapist, attending Al-Anon meetings, church, and meeting with her minister.  J68.  By the date of the Second Sentencing Hearing, by selling many of her personal items and liquidating family assets, including her family home, Appellee has made partial restitution in the amount of $81,396.10, giving up nearly her entire net worth.  SJA17; JA69, 278.

## SUMMARY OF THE ARGUMENT

While public pressure may demand that Appellee serve a period of incarceration for having embezzled more than $350,000 from her employer while working as a bank teller, the

---

[6] This issue was not addressed significantly at the Second Sentencing Hearing.

9

facts and circumstances of her situation and the situation of those around her dictate otherwise.

At the two sentencing hearings and during the course of the investigation by the Probation

Office, the dependence on Appellee by her two children and mother was clear, as was her role in

the community, her mental and emotional disorders, her physical health, and her use of the

embezzled funds to help others. Also, she made a substantial commitment over time to improve

herself emotionally, mentally, and spiritually, and to liquidate nearly all of her assets to pay back

as much money as possible. Any one of the foregoing warranted the District Court reducing her

sentence from that dictated by the Sentencing Guidelines, and consideration of these factors in

combination only further supports the District Court's sentencing decision.

The Court did err, however, in finding that Appellee abused a position of trust. First, the

District Court considered facts not admitted to by Appellee, in violation of the Sixth Amendment

as explained in *Blakely v. Washington*. Second, the facts, including a statement from one alleged

victim, did not support this finding. As a result, this Court should affirm the sentence imposed

but reject the finding that Appellee abused a position of trust.

## ARGUMENT

I.   **STANDARD OF REVIEW**

This Court reviews any factual findings by the District Court for clear error, and issues of

law de novo. *See, e.g., United States v. Laljie*, 184 F.3d 180, 194 (2d Cir. 1999) (explaining that

whether position is one of trust is question of law reviewed de novo, while whether defendant

used that position significantly in facilitating offense is question of fact and reviewed for clear

error). As for the District Court's application of the Sentencing Guidelines to the facts, while the

PROTECT Act, Pub. L. No. 108-21, 117 Stat. 650 (2003), may allow this Court to review this

issue de novo, the Guidelines are unconstitutional. *See Blakely v. Washington*, 124 S.Ct. 2531,

2543-44 (O'Connor, J., dissenting) (2004); *United States v. Croxford*, 324 F. Supp. 2d 1230, 1238-41 (D. Utah. 2004). Accordingly, any review of the District Court's determination of the Appellee's sentence is for an abuse of discretion.

In *Blakely v. Washington*, the U.S. Supreme Court found that the Sixth Amendment right to jury trial makes unconstitutional the imposition of any sentence above the statutory maximum prescribed by the facts found by a jury or admitted by the defendant. 123 S.Ct. at 2537-38. *Blakely* directly impacts Appellee's sentence to extent that her offense level was enhanced unconstitutionally two steps for her alleged abuse of a position of trust. *See id.* and discussion, *infra*, Argument, Section II. *Blakely* further impacts Appellee's sentence because it leads to the conclusion that the Sentencing Guidelines are unconstitutional. *See Blakely*, 124 S.Ct. at 2543-44. Therefore, the PROTECT Act's requirement that this Court review application of the Guidelines de novo lacks force.[7]

As detailed below, even if the U.S. Supreme Court does not strike down the Sentencing Guidelines as unconstitutional, the enhancement based on a finding of abuse of trust cannot stand. *See, e.g., United States v. Gonzalez*, 2004 WL 144872 (S.D.N.Y. June 28, 2004) (considering only admitted facts in issuing sentence). That finding is based on facts never admitted by Appellee, and is not supported by the preponderance of the evidence. Moreover, the facts concerning Appellee's family ties, mental condition, aberrant behavior, and other grounds noted by the District Court, including a combination of grounds, bring her case outside the heartland and authorize the Court to depart from the Sentencing Guideline range. *See United*

---

[7] While the Plea Agreement indicates a limited waiver of Appellee's rights to challenge application of *Apprendi v. New Jersey*, 120 S. Ct. 2348 (2000) to her sentencing, that waiver does not apply to *Blakely*'s impact, which further limited Appellee's sentencing range based on her admissions and the reduction for her acceptance of responsibility. *See United States v. Shamblin*, 323 F. Supp. 2d 757 (S.D. W.Va. June 30, 2004) (analyzing *Blakely* and explaining that it further limited defendant's sentencing range as compared to *Apprendi*).

11

*States v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995) (explaining that because Court of Appeals "hears relatively few Guideline cases compared to the district courts, the district court[ has a] better feel for the unique circumstances of the particular case before it, and special competence in determining whether that case falls within the heartland," and affirming departure based on combination of factors, including restitution made by defendant (quotations and citations omitted)). Once that bridge is crossed, this Court's "review of the extent or degree of such a departure continues to be for abuse of discretion." *United States v. Kostakis*, 364 F.3d 45, 51 (2d Cir. 2004).

Accordingly, this Court, while correcting the finding that Appellee abused a position of trust, should affirm the sentence ordered by the District Court.

## II.    THE FACTS AND CIRCUMSTANCES REQUIRE AFFIRMING APPELLEE'S SENTENCE

Regardless of which standard of review is applied, with the exception of the finding that Appellee abused a position of trust, Appellee's sentence should be affirmed because of (A) her extraordinary community and family ties and responsibilities, particularly the care of her daughters and her ailing mother; (B) the role of her mental and emotion health in the offense conduct; (C) her use of the embezzled funds to prevent other harms; (D) her extraordinary acceptance of responsibility and rehabilitative pre-sentencing conduct; (E) and her health. Moreover, the combination of the foregoing factors support the sentence that she received.

Even if the Sentencing Guidelines are upheld by the Supreme Court, the Court may impose a sentence outside the range established by the Guidelines if the Court finds that there are circumstances not adequately taken into consideration by the Sentencing Commission that should result in a different sentence. 18 U.S.C. § 3553(b). The Guidelines also provide that a characteristic or circumstances that is "not ordinarily relevant" in the Commission's view in

12

determining a sentence may be relevant if such a characteristic or circumstance is present to an unusual degree and distinguishes the case from the "heartland" cases in the guidelines. U.S.S.G § 5K2.0. If, as is the case here, there are compelling considerations that take a case out of the heartland cases set forth in the Guidelines, this Court has emphasized that the Court may consider a downward departure. *See United States v. Monk*, 15 F.3d 25, 29 (2d Cir. 1994).

### A. Appellee's Extraordinary Community and Family Ties and Responsibilities

Family ties and responsibilities are not "ordinarily relevant in determining whether a sentence should be outside the guidelines," U.S.S.G. § 5H1.6; but if, as here, the circumstances related to those factors are extraordinary, a sentencing court is not precluded as a matter of law from considering them in making a downward departure. *See United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991); *United States v. Sharpsteen*, 913 F.2d 59, 63 (2d Cir.1990); U.S.S.G. § 5K2.0. As this Court has explained,

> The rationale for a downward departure here is not that [defendant]'s family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.

*United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (affirming 13-level departure where defendant had multiple children and no support from children's fathers). *See also Alba*, 933 F.2d at 1122 (concluding that defendant had close-knit family whose stability depended on defendant's continued presence).

At Sentencing, Appellee's family ties and responsibilities placed her situation outside the heartland cases contemplated by the Commission. Essentially, the PSR and Sentencing Hearings supported the District Court's factual determination that she was the responsible caretaker of her minor daughter, her older daughter, and her mother. Even her mother-in-law identified Appellee's critical role and undercut any contention that her son, Mr. Godding, could fulfill

13

those roles. Appellee also made a financial contribution[8] to her family and played an active role in her community.

As for the Government's assertion that others would step forward in Appellee's absence, as the District Court put it: "Talk is cheap." J97. The Government's position essentially is that Mr. Godding and other persons were doing the wrong thing – not coming forward and affirming that they would care for Appellee's mother or two daughters, despite inability and history of not doing so – but should be counted on to do the right thing – filling the voids in care giving created by Appellee's incarceration.

### 1.    **Appellee's role with her children**

Appellee was the primary caretaker for her then six-year-old daughter and an important support for her older daughter, and she provided economic support to both as well. Though Appellee's oldest child, Cheyenne Godding, had recently reached the age of majority, she still relies heavily upon Appellee for stability and support. She had a five-year history of significant problems requiring medical treatment, mental health treatment and treatment for drug abuse, and struggles with sobriety. Due to his emotional abuse, Ms. Godding had no significant relationship with her adoptive father, Appellee's husband, and receives no support from him. However, she sees Appellee daily and relies on her for support and guidance. Accordingly, the District Court concluded that Appellee's tie to these daughters warranted a departure.

The Government's assertion that others could fill these roles cannot meet the clear error standard necessary to undermine the District Court's findings to the contrary. Appellee's husband is employed full time and is shown to have emotional problems which began about the

---

[8] *See United States v. Galante*, 111 F.3d 1029, 1036-37 (2d Cir. 1999) (affirming departure based on family circumstances and discussing relevance of economic condition of defendant's family in affirming departure)

time of the birth of their now six-year-old daughter. He also has been emotionally abusive and unable to maintain a relationship with their older daughter, and the District Court had well-supported concerns about his ability to care for their minor daughter. If Appellee were not available to this young child, it would have a significant, detrimental impact on the child's life. Due to age and medical conditions, neither Appellee's mother, nor her husband's mother would have been able to care for her minor child on a permanent basis.

Indeed, contrary to the Government's elevating Mr. Godding, the District Court found that

> there was a substantial and abject absence of any significant support on the part of the defendant's husband insofar as discharging the obligations to the family, including specifically his own family, the defendant herself and those two children. Indeed, I might be predisposed to suggest that in some way his lack of any contribution to the family in the psychological sense be avoided and obviated by some different arrangement insofar as the relationships between the defendant and him are concerned, but that, frankly, is not my prerogative.

JA90; JA57-59 (finding Mr. Godding "useless"). Furthermore, the Government initially agreed: "I don't see anything in the PSR that suggests that [Mr. Godding]'s going to step forward and carry out his responsibilities." JA58.

### 2.    Appellee's role with her mother

Appellee's mother suffered from heart disease, diabetes, ulcerated veins that bleed through her stomach requiring regular cauterization and occasional transfusions. SJA8. Appellee provided the day-to-day needs for her mother. She cleans her house, cooks her meals, provides her endless transportation, and sees to it that she receives necessary medical treatment. SJA9. Appellee's mother related to the probation officer that "she does not know how she will make it without her daughter's help." *Id.* In short, departure was further warranted due to Appellee's role in her mother's life.

15

As for the prospect of others stepping forward to care for Appellee's ailing mother, the District Court's finding are to the contrary and supported by the record: "She's got siblings to be sure, but she's the one that's stepped forward. . . . I don't see the prospect of anyone else reliably stepping forward to take that responsibility." JA 57-59. Appellee's own brother stated that he did not believe there was anyone in his family who would be able to take Appellee's place in caring for their mother. JA229. Moreover, he has readily admitted that, though he lives nearby his mother, the most he ever does is put her newspaper in the front door or throw sand on the walk, usually without even checking in to see his mother. JA229. Furthermore, the availability of others to care for Appellee's children and mother is not determinative. *See Johnson*, 964 F.2d at 129 (noting distinction from *Alba*, which affirmed departure even though defendant had spouse who could have cared for children and elderly parents).

### 3.    Appellee's role in the community

As the outpouring of support demonstrated to the Court, *see* SJA9, SSJA, Appellee plays a critical role in her community through volunteer and other efforts. This conduct alone warranted a departure. *See United States .v Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming departure where defendant had a kidney transplant over 20 years ago, and his new kidney was diseased but stable, requiring regular blood tests and prescription medicines and monitoring of related double hip replacement, and defendant also had participated to large degree in legitimate fund raising efforts, including to raise money for the Kidney Foundation).

In sum, due to these three significant family ties and her role in the community, and the absence of others to fill her roles, Appellee's case is outside the ordinary characteristics that were contemplated by the Sentencing Commission. *See, e.g. United States v. Huerta*, 371 F.3d 88, 95 (2d Cir. 2004) (reasoning that absence or presence of adults who can step in during the

16

defendant's incarceration to assist with caring and providing for the defendant's dependents--is a central part of the extraordinary family circumstances inquiry). These extraordinary circumstances warrant a downward departure. *See, e.g., Alba*, 933 F.2d at 1122 (affirming departure where defendant had been married for 12 years, lived with his wife and their two daughters, his disabled father -- who depended on defendant to help him get in and out of his wheelchair -- and his paternal grandmother, and had long-standing employment including two jobs to maintain his family's economic well-being).[9]

### B.    Appellee's Mental and Emotional Health

While mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, a sentence below the applicable guideline range may be warranted if the defendant committed the offense while

---

[9] *See also United States v. Rose*, 885 F. Supp. 62 (E.D.N.Y.1995) (downward departure granted where defendant had assumed role of surrogate father to his cousins and contributed to the household budget of his grandmother, who had no social security or pension); *United States v. Ekwunoh*, 888 F. Supp. 369, 373-74 (E.D.N.Y.1995) (downward departure granted where defendant was sole support for three young children and oldest child had emotional problems); *United States v. Vaughan*, No. 92 Cr. 575-04, 1993 WL 119704 (S.D.N.Y. Apr.15, 1993) (downward departure granted where defendant was sole caretaker for his wife, who suffered from Alzheimer's disease); *United States v. McGee*, 802 F. Supp. 843, 844 (E.D.N.Y.1992) (downward departure granted where defendant's nephew depended on her for safety, health and education); *United States v. Gerard*, 782 F. Supp. 913 (S.D.N.Y.1992) (downward departure granted where defendant was sole care provider and breadwinner for her two teenage children); *United States v. Handy*, 752 F. Supp. 561, 564 (E.D.N.Y.1990) (downward departure granted where defendant was single mother raising three teenage children); *see also United States v. Najjar*, No. 96-1478, 1997 WL 87231 (2d Cir. Mar. 3, 1997) (summary order) (affirming departure where, *inter alia*, incarceration of defendant would deprive family of means of support); *United States v. Big Crow*, 898 F.2d 1326, 1331-32 (8th Cir.1990) (affirming downward departure based on employment history, community ties, and successful support of family despite economic hardship of living on Indian Reservation, was not an abuse of discretion). *Cf. United States v. Faria*, 161 F.3d 761 (2d Cir. 1998) (departure not warranted where defendant did not live with children and wife earned $40,000/year).

17

suffering from a significantly reduced mental capacity. U.S.S.G. § 5K2.13.[10] To establish diminished capacity a defendant must establish both "reduced mental capacity and a causal link between that reduced capacity and the commission of the charged offense." *United States v. Prescott,* 920 F.2d 139, 146 (2d Cir.1990). Any departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense. *Id.*

At all times relevant to this matter, Appellee was suffering from a significantly reduced mental capacity. She suffered from Avoidant Personality Disorder, which affected her capacity to weigh the illegality of her actions against the compelling need to please her husband, help others, and avoid the serious problems in her life, and realize that the illegality outweighed her compulsion. SJA14-15. That was a significant factor in causing Appellee to conduct herself as she did at the Bank over the years. The fact it went undetected by the Bank only augmented her already distorted view of her actions.

Appellee worked for the National Iron Bank for ten years without performing any illegal conduct. The timing of the offensive conduct is coincident with the timing of the significant stressors in her life, combined with her preexisting Avoidant Personality Disorder, all of which served to exacerbate her condition and symptom manifestations. To this point, Tsukroff explains that Appellee "could not jeopardize the stability of the marriage by acting in ways her husband would not approve of—by seeking help outside the family for her addicted daughter when their resources ran out. So she turned to crime to pay for the treatment the adolescent daughter

---

[10] There are exceptions to this rule which preclude the Court from departing below the applicable guideline range, but those exceptions do not apply to Appellee. The exceptions are as follows: the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. *Id.*

desperately needed. And she also used money to help others in need, to buy nice things for people who would appreciate her." The content of Tsukroff's report and the context of the offense conduct show that the offense conduct was <u>directly</u> related to her diminished mental capacity. Importantly, Tsukroff opines that the "very qualities which contributed to Ms. Godding making a disastrous choice are otherwise a benefit to her family and the community." Tsukroff specifies the particular progress that Appellee has made in attending therapy and explains that Appellee continues to work on her own issues. This important fact shows that Appellee for the first time in her life has recognized that she suffers from a disorder and is taking ownership of her own treatment and recovery.[11]

At the time of the offense conduct, Appellee was suffering from her as-yet-undiagnosed and -untreated Avoidant Personality Disorder. She was also struggling with critical issues with her marriage, her children (especially her oldest child), and within her family. Appellee's mental and emotional conditions diminished her mental capacity.

Dr. Grenier, who concluded that Appellee suffered from a borderline personality disorder among other afflictions, SJA57,[12] supported Tsukroff's analysis.

> Ms. Godding's early family experiences have led to the development in her of chronic depression and anxiety, as well as a personality structure which reflects significant fears of being rejected and abandoned. Thus, it is not surprising that she would try to find ways to allay these fears in herself. Her participation in the instant offense was meant to do this . . ..

SJA57-58. Dr. Grenier also emphasized the need for continued therapy for Appellee, a point on which the District Court specifically relied in departing. SJA58, JA311.

---

[11] Appellee's Sentencing Memorandum, dated December 18, 2003, at Exhibit A, holds the contents of Tsukroff's report, which was not included by the Government in the Joint Appendix.
[12] The Government did not dispute that Appellee suffers a borderline personality disorder. JA303.

The District Court did not credit Dr. Grayson's opinion over that of the other two experts, and for good reason. Dr. Grayson never met Appellee,[13] and, at best, had only a fraction of the information necessary to formulate a reliable opinion in this matter. JA145. Dr. Grayson had only the following documents: 1) pages 1 through 6 of the Defendant's Sentencing Memorandum; 2) Ms. Tsukroff's report of 11/10/2003, but no other medical or psychological documentation or history; and 3) hearsay in the form of letters or notes, one of which was unsigned and another was the Bank's self-serving submission. JA145.

### C.    Lesser Harms

As discussed *supra*, Appellee used the bulk of the money to benefit others in the way of medical care for her daughter, bills for relatives and friends, gifts of money or goods to relatives and friends, charitable donations. She also used some of the money for her children and her own family's bills. She also used some of the money to appease her husband.

Sometimes, a defendant may commit a crime in order to avoid a perceived greater harm. U.S.S.G. § 5K2.11. In such instances, a reduced sentence may be appropriate, provided that the circumstances significantly diminish society's interest in punishing the conduct. *Id.* Appellee utilized the majority of the embezzled funds to alleviate situations that she perceived to be greater harm. She used the funds to provide the mental health care and medical treatment that her daughter needed, and to provide everything for her daughter in hopes of ameliorating her daughter's conditions. SJA11, 45. She used the funds to pay for her husband's sister's family bills for approximately two years. *Id.* She made charitable donations. Essentially, Appellee used the funds in an effort to make others' lives better, SJA11, 15, 45-46, supporting the District Court's conclusion that her use of the funds warranted a departure. JA318-19.

---

[13] The Government never filed a motion for an order directing Appellee to meet with its psychiatrist.

20

**D.**    **Extraordinary Acceptance of Responsibility and Pre-sentence Conduct**

Where, as here, a person makes a substantial commitment over time to improve that person's conduct, that effort and resulting change may serve as a basis for departure. *See United States v. Bryson*, 163 F.3d 742, 749 (2d Cir. 1998) (explaining that depending "on the baseline from which an individual's extraordinary rehabilitation can be measured," as a basis for departure, "achievement of the ordinary responsibilities of citizenship, such as regular employment and support of dependants may, depending on the starting point of rehabilitation, be sufficient if that achievement is the product of substantial commitment sustained over time").

As this Court has explained,

> Congress expressed no hostility to rehabilitation as an objective of *sentencing*, and required sentencing judges to consider, among other things, "provid[ing] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Since rehabilitation may not be a basis for incarceration but must be considered as a basis for a sentence, Congress must have anticipated that sentencing judges would use their authority, in appropriate cases, to place a defendant on probation in order to enable him to obtain "needed ... medical care, or other correctional treatment in the most effective manner." Indeed, the Sentencing Reform Act explicitly authorizes probation as a permissible form of sentence. *Id.* § 3561.

*United States v. Maier*, 975 F.2d 944, 946-47 (2d Cir.1992). More importantly, here, rehabilitation, including post-conviction rehabilitation, may justify a downward departure from the sentencing guidelines range. *See United States v. Cornielle*, 171 F.3d 648 (2d Cir. 1999); *Maier*, 975 F.2d at 948; *United States v. Core*, 125 F.3d 74, 75 (2d Cir.1997).

Appellee has lost her home, which was sold on January 20, 2004, and all but her essential material possessions. As a consequence of her actions, Appellee separated from her husband,[14]

---

[14] Although the PSR makes reference to Mr. Godding's intent to divorce Appellee, the Connecticut Judicial Branch website does not indicate that a filing has been made.

21

and must endure a family torn apart. She had lost her employment. Importantly, she had suffered public humiliation and the loss of standing in her community, where she had lived her entire life and where her family lives, which clearly was critical to her, as evidence by the numerous letters in the PSR from members of the community. Many private facts about Appellee and her family were made public in this matter, and, in her small town, Appellee and her family had become the subject of bitter and flagrant gossip and horrible confrontations. JA259. In essence, Appellee's life is devastated and will never be the same, even without time in prison.

In the face of this, Appellee has taken extraordinary steps to rehabilitate herself and take responsibility. Appellee has undergone therapy. J68. Appellee has returned to her church and is working with her minister to address her disorder from a spiritual perspective. *Id.* Appellee has liquidated what assets she had to pay partial restitution to this point. SJA17, JA69, 278.

Moreover, from the beginning of the investigation, Appellee has cooperated fully with investigating authorities. She met on several occasions with the investigating officer and agent, even after giving her initial statement. She promptly entered into a plea agreement with the Government. In fact, following her voluntary guilty plea, Appellee met with the investigators one more time at their request. Once Appellee admitted her wrongdoing, she immediately, of her own volition, sent letters of apology directly to employees of the National Iron Bank and all affected account holders, pledging to make full restitution. J19-20.

As found by the District Court, JA313, Appellee also took extraordinary steps to make significant restitution payments. By the date of the Second Sentencing Hearing, by selling many of her personal items and liquidating family assets, including her home, Appellee has made

partial restitution in the amount of $$81,396.10. JA69, 278. She was actively seeking employment to further her restitution payments.

Appellee's showing of remorse, her acceptance of responsibility, and the significant steps she has made toward paying restitution are outside the scope of the heartland cases considered by the Commission and warranted the downward departure.

### E.  Appellee's Health

The District Court also noted Appellee's mental and physical health as grounds for departure. JA90, 311; *see also* JA13. Dr. Grenier's report supported this ground, stating the importance of Appellee continuing to receive therapy. SJA58, JA311. Accordingly, the District Court did not commit clear error in finding that Appellee needed continued treatment and, within his discretion, sentenced her accordingly. *See Rioux*, 97 F.3d at 663 (affirming departure where defendant had a kidney transplant over 20 years ago, and his new kidney was diseased but stable, requiring regular blood tests and prescription medicines and monitoring of related double hip replacement, and defendant also had participated to large degree in legitimate fund raising efforts, including to raise money for the Kidney Foundation).

### F.  A Combination of the Foregoing

The Court may depart downwardly from the Sentencing Guidelines when a combination of the circumstances create a situation that differs significantly from the heartland cases covered by the guidelines, even when the circumstances do not warrant it when they are considered individually. *See, e.g., Cornielle*, 171 F.3d 648 (affirming one-level departure based on "unique combination of circumstances . . . considered as a whole"); *Rioux*, 97 F.3d at 663; *Broderson*, 67 F.3d at 459 (affirming departure based on combination of factors, including restitution made by defendant); U.S.S.G. § 5K2.0 commentary. Here, the combination of Appellee's facts and

23

circumstances, as detailed above, provide for an extraordinary case and warrant a downward

departure from the guidelines.

III.    **APPELLEE SHOULD NOT HAVE RECEIVED A TWO-LEVEL ENHANCEMENT FOR AN ALLEGED ABUSE OF TRUST**

The Sentencing Guidelines state:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.

U.S.S.G. § 3B1.3.  In the Commentary to this Section, the Guidelines explain

> "[p]ublic or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. . . . This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller.

To hold a position of trust, an employee must have discernible discretion, requiring

"significantly less supervision than employees whose responsibilities are primarily non-

discretionary in nature." *United States v. Reccko*, 151 F.3d 29, 31, (1st Cir. 1998).  In U.S.S.G. §

3B1.3, the Commission expressly states that it does not apply to "an ordinary bank teller."

A.    **The Enhancement Violated Appellee's Constitutional Rights Under *Blakely v. Washington***

Even if Appellee had held a position of trust with Mrs. Morgan or as a customer service

representative, under *Blakely*, these facts should not be considered by the Court.  *See Blakely*,

123 S.Ct. at 2537-38.  Appellee did not admit to the claims concerning Mrs. Morgan or to

holding any position other than bank teller.  Moreover, such facts are not part of the plea

agreement.  Consequently, any enhancement of Appellee's sentence concerning an abuse of trust

violates her Sixth Amendment rights and cannot stand.  *See id.*

24

**B.    Appellee's Offense Conduct and Related Conduct Did Not Constitute an Abuse of a Position of Trust**

Even if reviewed without consideration for *Blakely*, the two-level enhancement should not stand. Facts in support of sentencing factors such as relevant conduct generally must be established by a preponderance of the evidence. U.S.S.G. § 6A1.3, cmt.; *United States v. Sutton*, 13 F.3d 595, 599 (2d Cir. 1994).

Appellee's alleged dual role as customer service representative was, at most, a continuation of the teller position, and did not render her akin to a bank executive and into a position of trust. *Cf. United States v. Lee*, 324 F. Supp. 2d 165 (D. Me. 2004) (finding that customer marketing advisor for MBNA was not in position of trust even though she was responsible for applying payments to customer accounts, handling monetary transfers, and addressing customer inquiries, and her customer transactions were not immediately reviewed due to the volume of transactions, because she answered to a direct supervisor, did not have authority to open customer accounts, loan money, increase credit limits, and her work was subject to monthly reviews and inquiries by MBNA fraud unit).[15] She did not hold a position of trust with the bank, and therefore her conduct while an employee of the Bank does not warrant a two-level increase. *Cf. United States v. Melendez*, 41 F.3d 797, 799 (2d Cir. 1994) (explaining that bank teller does not hold position of trust because he receives a precise sum of money at start of day

---

[15] In support of finding Appellee in a position of trust, the Government submitted a generic job description allegedly outlining Appellee's job duties with the Bank, JA137-38, and a self-serving, unsigned additional description, JA136. Notably, the job description does not articulate any managerial responsibilities above that of an ordinary teller. The position title, in fact, is "sales associate," not "manager" or "assistant manager," or even "lead teller." The position, by the Bank's own definition, requires supervision and is not autonomous. There was no credible evidence that Appellee ever held the title of manager or assistant manager, or regarding whether (1) all employees had the key and combination code to which the bank made reference; (2) Appellee had all of the combinations or, like other employees, had part of a series of combinations; and (3) she could open the vault by herself.

and must account for it by end of day). Moreover, the Bank's negligence in auditing facilitated her conduct, *see* JA314, regardless of whether the accounts involved were held by Mrs. Morgan or others.

With further regard to Appellee's position as bookkeeper for Mrs. Morgan, Mrs. Morgan herself told the Probation Officer that Appellee did not have the authority to write checks from her accounts. SJA5. In short, she did not manage the accounts; she merely kept track of them. *Cf. Laljie*, 184 F. 3d at 194-95 (finding personal executive secretary held position of trust where she had broad, professional and managerial discretion to pay boss's bills, handle employer's checking accounts, put calls through, impact a business deal, schedule appointments, plan trips, and make deposits, payments, and credit card purchases for matters related both to business and personal functions).

Access is not enough or determinative of whether a person has abused a trust. "The primary trait that distinguishes a position of trust from other positions is the extent to which the position provides the freedom to commit a difficult to detect wrong." *Laljie*, 184 F.3d at 194 (emphasis added; internal quotations omitted). Whether a given position is one of trust within the meaning of § 3B1.3 is to be viewed from the perspective of the victim. *Id.* at 195 (emphasis added). Here, the alleged victim's own statements indicate that Appellee was not in a position of trust, nor can that conclusion be drawn by virtue of the position of bookkeeper itself. *See id.* (explaining that position of trust cannot be assumed where defendant, not by reason of his position, is subject to relaxed supervision).

In short, in light of Appellee's bookkeeping duties in which, according to her boss and the victim, she had limited discretion, there has been no adequate showing that Appellee actually

26

engaged in inappropriate conduct, related or not, other than that to which she has plead.[16]

Consequently, Appellee did not hold the "position of trust" warranting a two-level sentence enhancement.

## CONCLUSION

For the foregoing reasons, the Appellee requests that the Court hold that the facts do not support the conclusion that Appellee abused of a position of trust but otherwise affirm the decision of the District Court.

Dated: November 15, 2004

Respectfully submitted,

*Charles F. Willson*

Charles F. Willson
NEVINS & NEVINS LLP
PO Box 280658
East Hartford, CT  06128
860-289-4455
fax:  860-289-8968
cwillson@nevinslaw.com

## CERTIFICATION OF SERVICE & COMPLIANCE

This is to certify that the foregoing brief has been served by first-class mail, postage prepaid, on counsel for the Appellant United States, John A. Danaher, Assistant U.S. Attorney, U.S. Attorney's Office, 450 Main Street, Room 328, Hartford, CT 06103, and that the brief is in compliance with Fed. R. App. P. 32(a)(7).

*Charles F. Willson*

Charles F. Willson

---

[16] While Appellee did not file a separate notice of appeal, because of the departure, there was no incentive to do so. As the District Court stated: "I'm going to leave the two level enhancement. It's not going to make any difference as a practical matter." JA21 (emphasis added).